## AFFIDAVIT OF JAMES KECZKEMETHY

I, James Keczkemethy, being duly sworn, state under oath as follows:

## INTRODUCTION

1.  I am a Special Agent employed by the DEA, and have been so employed since October 30, 2017. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United Stated Code and a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws, and duly authorized by the Attorney General to request a search warrant. Prior to my employment with DEA, I was a Police Officer in Hartford, Connecticut for over 6 years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws including, but not limited to, narcotic violations.

2.  During my law enforcement career, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. Many of those investigations resulted in arrests, indictments and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants and the execution of search, seizure and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging and texture of many controlled substances.

3. As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, and dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, crack cocaine, marijuana, prescription medications and others. I have debriefed numerous defendants, informants and witnesses who have had personal knowledge about drug activities and the operation of drug trafficking organizations. I have sworn out numerous affidavits in support of search warrants, arrest warrants and other Court applications.

## PURPOSE OF AFFIDAVIT

4. I am submitting this affidavit in support of a search warrant for a storage unit located at 16 Commerce Way, Unit 89, Milton, New Hampshire 03851 (hereinafter, the "Target Location"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

5. As further discussed below, there is probable cause to believe that, the Target Location, described in Attachment A, contains records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; and (d) money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, the "Target Offenses"). More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Location there is evidence of the Target Offenses, as described in Attachment B.

2

6.  I have personally participated in this investigation since August 2020. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agencies; and (d) my experience and training as a criminal investigator.

7.  Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses will be found in the Target Location, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant and criminal complaint. All times herein are approximate.

## PROBABLE CAUSE

### August 31, 2020: HAYCOCK purchased approximately 310 grams of suspected fentanyl

8.  In August 2020, a confidential informant ("CI"), provided information to investigators about a fentanyl dealer whom he knew as Jack, later identified as Jack HAYCOCK ("HAYCOCK").[1] The CI informed investigators that "Jack" was a fentanyl dealer in the Rochester area of New Hampshire. The CI described that, as recently as last week, the CI saw "Jack" with 50 "fingers," a "finger" is a common street term for 10 grams of fentanyl. In other words, the CI saw HAYCOCK with 500 grams of fentanyl. The CI informed investigators that last week, the CI purchased one "finger" of fentanyl from HAYCOCK. The CI further explained

---

1 The CI has a criminal history including theft and drug-related offenses. The CI is a user of illegal narcotics. Further, the CI has cooperated with law enforcement since August 2020 for consideration in a pending criminal matter. Information received from the CI was corroborated as described below, and I believe that the information received from the CI is reliable.

3

that HAYCOCK typically traveled to Lawrence, Massachusetts to obtain his fentanyl. HAYCOCK, however, did not drive his own vehicle with New Hampshire plates into Lawrence. Rather, according to the CI, HAYCOCK typically parked in Plaistow, New Hampshire, a short distance from Lawrence, and took an Uber from Plaistow to Lawrence. I believe that HAYCOCK did this in order to not draw attention to himself with his out-of-state license plates.

9. On August 31, 2020, at 1:03 p.m., the CI, under the direction and supervision of investigators, called HAYCOCK using (603) 262-0918. This call was recorded. During the call, the CI offered to drive HAYCOCK to Lawrence, Massachusetts from Plaistow in order for HAYCOCK to be resupplied with fentanyl. The CI ordered two "fingers" and requested a deal in exchange for the ride. HAYCOCK agreed that he would provide the CI with two "fingers" at cost in exchange for the ride. No specific price was discussed. At 1:53 p.m., again under the direction and supervision of investigators, the CI called HAYCOCK. This call was also recorded. During this call, the CI and HAYCOCK agreed to meet at a cigarette store in Plaistow, New Hampshire. Also during the call, HAYCOCK informed the CI that he needed to stop by his safe to retrieve money.

10. Prior to their meeting, investigators searched the CI and the CI's vehicle for contraband and money with negative results. Investigators provided the CI with $400 of official agency funds for the arranged purchase, in the event HAYCOCK required money before being resupplied with fentanyl. Investigators also equipped the CI's vehicle with a GPS device and an audio and video recording and surveillance device. This recording is preserved. Thereafter, at 2:55 p.m., investigators surveilled the CI travel to a cigarette store in Plaistow, New Hampshire where the CI met with HAYCOCK, who entered the front passenger seat of the CI's vehicle. The conversation between the CI and HAYCOCK in the vehicle was recorded. During the drive

4

from Plaistow to Lawrence, HAYCOCK stated to the CI that he was making a lot of money in his drug business. The CI later informed investigators that HAYCOCK also informed investigators that he kept a safe at his mother's house.

11. Investigators maintained surveillance of the CI and HAYCOCK as the CI drove to the area of Essex Street and Warren Street in Lawrence. In that area, HAYCOCK exited the CI's vehicle with a backpack and investigators maintained surveillance of HAYCOCK. Other investigators followed the CI to a pre-determined meeting location away from HAYCOCK. There, investigators retrieved the $400 of official agency funds, the GPS device, and the audio and video recording and surveillance equipment from the CI.

12. Investigators surveilled HAYCOCK meet with an unknown Hispanic male (later identified as Francis FRANCO Vizcaino ("FRANCO")) in the area of Essex Street and Warren Street. FRANCO was holding a black plastic bag as he met with HAYCOCK. HAYCOCK placed a backpack on the ground and FRANCO appeared to place something into the backpack. HAYCOCK then handed FRANCO an item, and the two men embraced and parted ways. Based upon my training and experience and knowledge of this investigation, I believe that FRANCO provided HAYCOCK with fentanyl and subsequently HAYCOCK provided FRANCO with payment for those drugs.

13. Investigators let HAYCOCK and FRANCO depart and walk separate ways before they stopped HAYCOCK in the Market Basket parking lot at 700 Essex Street. Investigators searched HAYCOCK's backpack and found 31 cylinders of a compressed, tan powdery substance wrapped in green cellophane. The cylinders had the typical appearance of a "finger" of fentanyl. I believe that the 31 cylinders contain approximately 310 grams of suspected fentanyl. Based upon my training and experience and knowledge of this investigation, I believe

5

that the substance contains fentanyl.  An investigator provided HAYCOCK with *Miranda* warnings, and HAYCOCK stated that he provided FRANCO with $6,000.  HAYCOCK was arrested and brought to the Lawrence Police Department for booking.  Investigators field tested the substance seized from HAYCOCK, which returned an inconclusive result.  Based upon my training and experience, I know that that, due to the potency of fentanyl and the relatively large percentage of diluting agents used to process fentanyl for ingestion, inconclusive results are common with substances suspected to contain fentanyl.  The suspected fentanyl will be transported to the DEA Northeast Regional Laboratory for confirmatory analysis.

14. A separate group of investigators stopped FRANCO who was walking on Landsdowne Court in Lawrence.  Investigators observed that, prior to being stopped, FRANCO discarded a potato chip bag onto the ground.  An investigator retrieved the potato chip bag, which contained approximately $6,000 cash wrapped in cellophane.  FRANCO was arrested and identified from a photo identification card that he had on his person.  Investigators then transported FRANCO to the Lawrence Police Department for booking.  The cash was secured, but not removed from the cellophane, and it will be processed and counted at a later time.  Based upon my training and experience and knowledge of this investigation, I believe that HAYCOCK provided $6,000 to FRANCO in exchange for the 31 "fingers" of fentanyl.

**Identification of the Target Location**

15. With the assistance of the Rockingham Sheriff's Department, in the evening of August 31, 2020, I located HAYCOCK's mother's residence in Rochester, New Hampshire.  The Rockingham's Sheriff's Department was familiar with HAYCOCK from a prior drug investigation. Upon arrival, I obtained written consent to search the residence from HAYCOCK's mother and HAYCOCK's brother.  Both individuals informed me that

HAYCOCK did not live at the address. Inside HAYCOCK's mother's bedroom, an investigator located a small safe that contained keys and a barcoded tag. HAYCOCK's mother informed investigators that the keys and safe belonged to HAYCOCK. Based upon my training and experience, I believe that the keys and barcoded tag access a storage unit.

16. Investigators spoke with HAYCOCK's mother, and asked if she or HAYCOCK rented a storage unit. HAYCOCK's mother stated that she did not rent one, but that HAYCOCK did. Upon further conversation, HAYCOCK's mother stated to investigators that "you might want to look in Milton," which I understood to mean Milton, New Hampshire, a short distance from her residence.

17. On September 1, 2020, members of the Rockingham Sheriff's Department located a storage location in Milton, New Hampshire, named "603 Self Storage." A member of the Sheriff's Department asked an employee at 603 Self Storage if HAYCOCK rented a storage unit with 603 Self Storage. An employee with 603 Self Storage informed investigators that HAYCOCK rented the Target Location in his name.

## Drug Traffickers' Use of Storage Units Generally

18. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of search warrants at the storage units of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' storage units:

   a. Controlled substances.

   b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of Target Location 2. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

19. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their storage units records relating to their drug trafficking activities.

20. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities in their storage units for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

21. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at in their storage units, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

22. Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many

9

experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in storage units.

23.     During the searches of storage units, I and other agents have also found items of personal property that tend to identify the person(s) in occupancy, control, or ownership of the storage unit.  It is common for drug traffickers to rent storage locations that are subscribed to in the names of friends, relatives, and/or significant others.  This is done in an effort to thwart law enforcement detection.  Evidence of rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their storage units, such as mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of control linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of controlled substances is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

24. Based on my training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity or at their storage units. Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their storage units. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug traffickers' residences.

25. Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

26. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that drug traffickers regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

27. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via telephone, text messages, and the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others

through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

28. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system

configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

29. Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B will be found at the Target Location described in Attachment A.

## CONCLUSION

30. Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that in the Target Location, as described in Attachment A, there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment B. Accordingly, I respectfully request that a search warrant be issued for the search of the Target Location.

Respectfully submitted,

*/s/ James Keczkemethy*
James Keczkemethy
Special Agent
Drug Enforcement Administration

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this the 1st day of September, 2020.



Hon. Andrea K. Johnstone
United States Magistrate Judge
District of New Hampshire

## ATTACHMENT A

### (Location to be searched)

16 Commerce Way, Unit 89, Milton, New Hampshire 03851 ("Target Location"). A photograph of the front gate of the Target Location is attached.



## ATTACHMENT B

**(Items to be Seized from the Target Location)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses")

1. From January 2020 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records from January 2020 to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. From January 2020 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. From January 2020 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental

       agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6. Cellular telephones, computers, and other electronic storage media belonging to or used by Jack HAYCOCK.